IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MICHAEL G. KUKOLECK,**

    **Plaintiff,**

**v.**                                                                           **Civil Action No. 2:04-CV-55**
                                                                        **(Judge Robert E. Maxwell)**

**MINNESOTA LIFE INSURANCE
COMPANY, a Minnesota mutual
Company,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER GRANTING MINNESOTA LIFE
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

On June 10, 2004, Plaintiff, Michael G. Kukoleck, filed a Complaint For Damages in the Circuit Court of Webster County, West Virginia against the sole defendant in this action, Minnesota Life Insurance Company ("Minnesota Life"). The allegations stem from the denial of certain insurance benefits by Minnesota Life. Minnesota Life removed this case based on diversity jurisdiction on August 6, 2004.

The Plaintiff's Complaint For Damages alleges that, by denying his claim for benefits on behalf of his deceased wife under the Group Mortgage Accidental Death Insurance Policy in question, Defendant Minnesota Life breached its contract for coverage with the Plaintiff; that the Defendant violated Plaintiff's reasonable expectations with regard to the coverage he had purchased; and that the exclusionary language relied upon by Defendant in denying the Plaintiff's claim for benefits is outrageous, overly broad and violates public policy.

Minnesota Life Insurance Company's Motion for Summary Judgment and its Memorandum of Law in support thereof were filed with the Court on November 9, 2004; Michael Kukoleck's Objection and, Without Waiving the Objection, Response to Minnesota Life Insurance Company's Motion for Summary Judgment was filed with the Court on December 14, 2004; and Minnesota Life Insurance Company's Reply to Michael G. Kukoleck's Objection and, Without Waiving Said Objection, Response to Minnesota Life Insurance Company's Motion for Summary Judgment was filed with the Court on December 23, 2004.

In its Motion for Summary Judgment, Defendant Minnesota Life asserts that it is entitled to summary judgment with regard to each of the claims made by the Plaintiff in his Complaint For Damages. Specifically, the Defendant asserts that it has not breached its contract of insurance with the Plaintiff since the Plaintiff is not entitled to accidental death benefits under the Group Mortgage Accidental Insurance Policy in question. In this regard, the Defendant points out that the Policy in question expressly excludes coverage for death resulting from drugs voluntarily taken by an insured or death resulting from bodily illnesses or disease and that the Certificate of Death and Autopsy Report prepared following the death of Plaintiff's wife specified that she died of a result of an accidental prescription drug overdose which was exacerbated by pulmonary emphysema. The Defendant further asserts that the Plaintiff's claim under the doctrine of reasonable expectations also fails in light of the fact that the Policy in question is unambiguous and in light of the fact that the Plaintiff has not pled that Minnesota Life created an expectation that a prescription drug overdose was covered under the Policy in question. Finally, the Defendant asserts that the exclusions relied upon by Minnesota Life in denying Plaintiff's claim for coverage are valid and enforceable and are not outrageous, overly broad or in violation of public policy.

The Court has carefully reviewed Minnesota Life's Motion for Summary Judgment, as well as the memoranda of law in support of and in opposition thereto. The Court also heard oral argument from both parties on October 17, 2005. Upon mature consideration, the Court makes the following findings of fact and conclusions of law.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The claims made by the Plaintiff in his Complaint For Damages arise as a result of Defendant Minnesota Life's denial of a claim for benefits made by the Plaintiff under a Group Mortgage Accident Insurance Policy that had been purchased by the Plaintiff from Minnesota Life on February 27, 2003, naming both himself and his wife, Donna J. Kukoleck as insureds. The Plaintiff's wife, Donna J. Kukoleck, died March 3, 2003, which was four days after the Kukolecks' purchase of the Policy in question. On March 27, 2003, the Plaintiff submitted a claim for benefits under the Policy in question on behalf of his deceased wife. Minnesota Life requested and obtained from the Plaintiff copies of the Certificate of Death and Autopsy Report prepared following his wife's death, both of which determined that Mrs. Kukoleck's death was the result of accidental prescription drug overdose exacerbated by pulmonary emphysema. Thereafter, by letter dated June 12, 2003, Minnesota Life denied Plaintiff's claim for benefits and in doing so, expressly referenced two exclusions as set forth in the policy in question.

These exclusions are set forth in Page 3 of the Policy in question in a section entitled "Accidental Death Benefits," which provides as follows, in pertinent part:

> **What does death by accidental injury mean?**
>
> Death by accidental injury as used in this policy means that your death results directly and independently of all other causes from an accidental drowning or from an accidental injury which was unintended, unexpected, and unforeseen. Your death must occur within 180 days after the date of the injury. The injury must occur while coverage is in force. In no event will we pay the accidental

death benefit if your death results from or is caused directly or indirectly by any of the following: . . .

> (3) bodily or mental infirmity, illness or disease;
>
> (4) drugs, poisons, gases or fumes, voluntarily taken, administered, absorbed, inhaled, ingested or injected; . . .

Thus, the Court must determine whether Minnesota Life properly denied benefits to the Plaintiff under these exclusions and in light of the undisputed facts in this case.

### III. DISCUSSION OF LAW

**A. Should Minnesota Life's Motion for Summary Judgment be denied or held in abeyance because discovery was not completed at the time the Motion was filed?**

As a preliminary matter, the Court addresses the Plaintiff's contention that the Defendant's Motion for Summary Judgment should either be denied or held in abeyance in light of the fact that said Motion was filed "in the early stages of development" of the case and "well before the discovery period is terminated."

The issue of whether a district court abuses its discretion in entering summary judgment prior the non-moving party being given an opportunity to engage in discovery was very thoroughly addressed by the United States Court of Appeals for the Fourth Circuit in Harrods LTD v. Sixty Internet Dominion Names, 302 F.3d 214 (4th Cir. 2002) wherein the Fourth Circuit Court noted:

> Generally speaking, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the same time, the party opposing summary judgment "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 961 (4th Cir. 1996). If a party believes that more discovery is necessary for it to demonstrate a genuine issue of

material fact, the proper course is to file a Rule 56(f) affidavit stating "that it could not properly oppose a motion for summary judgment without a chance to conduct discovery." *Id.*

Harrods LTD, 302 F.3d at 244.

As recognized by the Defendant in its Reply brief, the Plaintiff in the matter now before the Court has not filed an Affidavit stating that he cannot properly oppose Defendant's Motion for Summary Judgment without a chance to conduct further discovery. This was also the case in Harrods LTD, and, in that case, the Fourth Circuit Court of Appeals ultimately found that the district court had been fully informed as to why Harrods UK was requesting the normal time to conduct discovery and that the purposes of Rule 56(f) had, accordingly, been served. Under those circumstances, the Fourth Circuit Court concluded that it would have been "unfair to penalize Harrods UK for failing to file the formal affidavit called for by the rule." Harrods LTD, 302 F.3d at 246. Nevertheless, the Fourth Circuit Court of Appeals issued the following *caveat* in footnote 19 of its opinion:

> Although the particular circumstances of this case mean that Harrods UK will not be penalized for failing to state its case for more discovery in an affidavit, we hasten to add that parties who ignore Rule 56(f)'s affidavit requirement do so at their peril. We reiterate that our court expects full compliance with Rule 56(f) and that the "failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans,* 80 F.3d at 961 (quotations omitted).

Id. at 246 n. 19.

The Plaintiff in the matter now before the Court has failed to avail himself of the protection provided by Rule 56(f) of the Federal Rules of Civil Procedure and has failed to file an affidavit setting forth legitimate needs for discovery. Instead, Plaintiff has merely asserted in his Objection to Minnesota Life Insurance Company's Motion for Summary Judgment that said

5

Motion was prematurely filed and should be either denied or held in abeyance until "a more appropriate time, namely after discovery has ended in the matter." In this regard, the Plaintiff's Objection makes no reference to Rule 56(f) of the Federal Rules of Civil Procedure and, more importantly, fails to specifically identify for the Court what discovery he would have availed himself of that would have made a material effect on the issues raised in the Defendant's Motion for Summary judgment. See <u>Onan v. County of Roanoke, Virginia</u>, 1995 WL 234290, at *3 (4th Cir. Apr. 21, 1995) (noting that "a party cannot persuasively complain that it was denied the opportunity to submit further materials where it has not established that it had something relevant to present.") (unpublished table disposition).

Applying the Fourth Circuit Court's holding in <u>Harrods LTD</u> to the matter now before the Court, the Court does not believe that the purposes of Rule 56(f) have been satisfactorily met by the Plaintiff. Accordingly, the Court finds that the Plaintiff has failed to properly advise the Court of his inability to fully oppose the Defendant's Motion for Summary Judgment without being given the opportunity to conduct further discovery. Accordingly, the Court will proceed to address the Defendant's Motion for Summary Judgment at this time.

**B.** **<u>The Standard for Summary Judgment.</u>**

From the text of Rule 56(c) of the Federal Rules of Civil Procedure, it is clear that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Motions for summary judgment impose a difficult standard on the movant; for,

it must be obvious that no rational trier of fact could find for the nonmoving party. <u>Miller v. Federal Deposit Ins. Corp.</u>, 906 F.2d 972, 974 (1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. <u>Anderson</u>, 477 U.S. at 252. To withstand such a motion, the nonmoving party must offer evidence from which "a fair-minded jury could return a verdict for the party." <u>Id.</u> "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create a fair doubt rather than encourage mere speculation. <u>Anderson</u>, 477 U.S. at 248; <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985). It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Industrial Co. v. Zenith Radio</u>, 475 U.S. 574, 587-88 (1986).

**C.  Did Minnesota Life properly deny the Plaintiff benefits pursuant to the terms of the policy in question?**

The Court agrees with the Defendant that the Plaintiff cannot show that Minnesota Life breached any term of the Policy in question by denying the Plaintiff's claim for benefits. Both the Certificate of Death and the Autopsy Report prepared following the Plaintiff's wife's death expressly find that she died as a result of an accidental prescription drug overdose exacerbated by pulmonary emphysema. Exclusions (3) and (4) of the section of the Policy entitled "What does death by accidental injury mean?" expressly exclude coverage for death resulting from, among other things, "bodily or mental infirmity, illness or disease" or "drugs,

7

poisons, gases or fumes, voluntarily taken, administered, absorbed, inhaled, ingested or injected."

The Court agrees with the Defendant that the exclusionary language used in sections (3) and (4) of the section of the Policy entitled "What does death by accidental injury mean?" is clear and unambiguous. As noted by the West Virginia Supreme Court of Appeals in Keffer v. Prudential Ins. Co., 153 W. Va. 813, 172 S.E.2d 714 (1970), "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Keffer, at syl. pt. 1.

The Court believes that the Defendant has met its burden of proving the facts necessary to the operation of exclusions (3) and (4) of the section of the Policy entitled "What does death by accidental injury mean?" As asserted by the Defendant, the undisputed facts in this case, in the form of the conclusions reached in the Certificate of Death and the Autopsy Report prepared following Mrs. Kukoleck's death, prove that her death falls within exclusions (3) and (4). Both documents conclude that Mrs. Kukoleck died as a result of an accidental prescription drug overdose, exacerbated by pulmonary emphysema.

Obviously, there can be no dispute that pulmonary emphysema is a "bodily or mental infirmity, illness or disease" within the meaning of exclusion (3) of the section of the Policy entitled "What does death by accidental injury mean?" Likewise, the Court agrees with the Defendant that there can be no doubt that the four medications specified by the Certificate of Death and the Autopsy Report as having resulting in the Mrs. Kukoleck's accidental overdose, namely, Carisoprodol, Diphenhydramine, Diazepam and Alprazolam, are "drugs" within the meaning of exclusion (4) of the section of the Policy entitled "What does death by accidental

injury mean?" As noted by Defendant, in his Autopsy Report, the Deputy Chief Medical Examiner for the State of West Virginia described these four substances as "prescribed medications." As further noted by the Defendant, the word "drug" is defined, in part, as "a substance used as a medication or in the preparation of "medication." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 385 (9th ed. 1987).

Additionally, the Court agrees with the Defendant that further credence that the four medications specified in the Certificate of Death and the Autopsy Report as having resulting in Mrs. Kukoleck's accidental overdose are "drugs" within the meaning of exclusion (4) is found in the fact that three of these medications, namely Alprazolam, Carisoprodol, and Diazepam, are listed as Schedule IV controlled substances in W. Va. Code § 60A-2-210(c). Schedule IV controlled substances are defined by W. Va. Code § 60A-2-210(a) as "the drugs and other substances, by whatever official name, common or unusual name, chemical name, or brand name designated, listed in this section." Finally, although Diphenhydramine is not a Schedule IV controlled substance within the meaning of W. Va Code § 60A-2-210(c), the MedlinePlus characterization of this substance as a "medication" lends further support to the assertion that this substance is also a "drug" within the meaning of exclusion (3) of the section of the Policy entitled "What does death by accidental injury mean?"[1]

For the foregoing reasons, the Court finds that there is no genuine issue of material fact with regard to the issue of whether Minnesota Life properly denied the Plaintiff benefits pursuant to the terms of the Policy in question, and the Court finds, as a matter of law, that the exclusionary language found in exclusions (3) and (4) of the section of the Policy entitled "What does death by accidental injury mean?" is clear and unambiguous and excludes

---

[1] MedlinePlus is an on-line service provided by the United State National Library of Medicine and the National Institutes of Health.

coverage for a death resulting from an accidental overdose of prescription medications exacerbated by pulmonary emphysema, such as the death suffered by the Plaintiff's wife. Accordingly, the Court must find that the Defendant is entitled to summary judgment with regard to this issue as a matter of law.

**D.      Is the Plaintiff entitled to coverage under the doctrine of reasonable expectations?**

The doctrine of reasonable expectations was addressed as follows by the West Virginia Supreme Court of Appeals in its opinion in the case of National Mutual Insurance Company v. McMahon & Sons, Inc, 177 W. Va. 734, 356 S.E.2d 488 (1987):

> This Court has adopted the doctrine of reasonable expectations. "An insurance contract should be given a construction which a reasonable person standing in the shoes of the insured would expect the language to mean." *Soliva v. Shand, Morahan & Co.,* 176 W.Va. 430, 345 S.E.2d 33, 35-36 (1986); *see Perkins v. Doe,* 177 W.Va. 84, 350 S.E.2d 711 (1986); *Hensley v. Erie Insurance Co.,* 168 W.Va. 172, 283 S.E.2d 227 (1981); *Thompson v. State Automobile Mutual Insurance Co.,* 122 W.Va. 551, 554, 11 S.E.2d 849, 850 (1940). With respect to insurance contracts, the doctrine of reasonable expectations is that "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." KEETON, *Insurance Law Rights at Variance with Policy Provisions,* 83 HARV. L. REV. 961 (1970).

McMahon, 177 W. Va. at 741, 356 S.E.2d at 495 (footnote omitted).[2]

Although the McMahon case expressly limited the application of the doctrine of reasonable expectations to those cases in which the policy language is ambiguous, the West Virginia Supreme Court of Appeals has since extended the doctrine beyond circumstances involving ambiguous policy language. As recognized by the Honorable Irene M. Keeley in a

---

[2] McMahon was later overruled on other grounds. See Potesta v. U.S. Fidelity & Guar. Co., 202 W. Va. 308, 504 S.E.2d 125 (1998).

September 25, 2003, opinion in the case of American Equity Ins. Co. v. Lignetics, Inc., 284 F.Supp.2d 399 (N.D.W.Va. 2003), Judge Keeley is quoted as follows:

> [I]n West Virginia, ambiguity is no longer a prerequisite for application of the doctrine of reasonable expectations. Both *Romano* and *Keller* establish that the doctrine may apply in situations where an insurer attempts to deny coverage based on an exclusion that was not communicated to the insured, or where there is a misconception about the insurance purchased.

Lignetics, 284 F. Supp. 2d at 406.

After carefully reviewing all matters of record; after hearing the argument of counsel presented; and after viewing all permissible inferences to be drawn from the underlying facts in the light most favorable to the Plaintiff, the Court does not believe that the facts of the matter now before the Court support the Plaintiff's claim that he had a reasonable expectation that his wife's death as a result of accidental overdose of prescription medications exacerbated by pulmonary emphysema would be covered by the Policy in question. The West Virginia Supreme Court of Appeals has held that "[i]n order to recover damages based on an expectation of insurance, a plaintiff must prove that the insurer created a reasonable expectation of insurance coverage." Keller v. First Nat'l Bank, 184 W. Va. 681, 685, 403 S.E.2d 424, 428 (1991). The undisputed facts in the matter now before the Court simply do not support such a showing.

The transcript of the February 27, 2003, telephone conversation during which the Plaintiff applied for and obtained the insurance coverage in question reveals that Minnesota Life's agent expressly advised the Plaintiff that he should carefully review the certificate of insurance once he received it since it would "describe your insurance benefits, limitations to coverage as well as exclusions that are specific to your state." Additionally, upon inquiry by the Plaintiff, Minnesota Life's agent advised him that the Policy in question would cover only accidental deaths and not natural deaths. Upon further inquiry by the Plaintiff, Defendant

Minnesota Life's agent advised him that the Policy in question would not cover a death caused by a stroke since it did not "cover illnesses of any kind or things like that."

The Court agrees with the Defendant that any expectations held by the Plaintiff that a death resulting from an accidental prescription overdose exacerbated by pulmonary emphysema would be covered by the Policy in question was created not by the Defendant, but by the Plaintiff himself. In this regard, the Court agrees with the Defendant that the Plaintiff's reliance on the television advertisement/solicitation that allegedly prompted the Plaintiff's February 27, 2003, telephone call to Defendant Minnesota Life and the mailed advertisement/solicitation received by the Plaintiff is misplaced. In his Affidavit in support of his Response to the Defendant's Motion for Summary Judgment, the Plaintiff expressly recognizes that each of these advertisements and solicitations addressed mortgage life insurance, when what he purchased from the Defendant was mortgage accidental death insurance. The Court agrees with the Defendant that there is absolutely no basis for imposing the Plaintiff's reasonable expectations with regard to mortgage life insurance on the mortgage accidental death insurance that he actually purchased.

For the foregoing reasons, the Court finds that there is no genuine issue of material fact with regard to the issue of whether the Plaintiff is entitled to coverage under the doctrine of reasonable expectation. Accordingly, the Court finds that the Defendant is entitled to summary judgment with regard to this issue as a matter of law.

E. **Are the exclusions relied upon by the Minnesota Life outrageous, overly broad, or contrary to public law?**

The Court agrees with the Defendant that exclusions (3) and (4) of the sections of the Policy entitled "What does death by accidental injury mean?" are not outrageous, overly broad or contrary to public policy. As recognized by the Defendant, courts have enforced similar

provisions in the past. In the case of Floramo v. Monumental Life Ins. Co. of Baltimore, MD, 447 F. Supp. 357 (N.D. Ill. 1978), the United States District Court for the Northern District of Illinois considered a policy that stated that "no benefit will be payable under this Provision if the insured's death results directly or indirectly, or wholly or partially from . . . taking any poison (drug or sedative) . . . whether voluntary or involuntary . . . ." and concluded that "since it is undisputed that Tuinal is a drug as that term is ordinarily used and that the insured died from an overdose of Tuinal, defendant is entitled to judgment declaring it not liable to plaintiffs for accidental death benefits." Floramo, 447 F.Supp. at 356-57. Similarly, in Heltsley v. Life & Cas. Inc. Co., 185 S.W.2d 673 (Ky. 1945), the Court of Appeals of Kentucky considered an exclusion in an accidental death policy which stated "nor does it cover loss or injury sustained by the insured while he has physically present in his body alcoholic or intoxicating liquors in any degree" and concluded that this exclusion was not contrary to public policy or unreasonable. Heltsley, 185 S.W.2d at 674.

Further, the Court agrees with the Defendant that there is no basis for assuming that the word "drugs" as used in exclusion (4) of the section of the Policy entitled "What does death by accidental injury mean?" refers only to illicit, illegal, recreational drugs and does not refer to prescription medications. Not only does this limitation on the definition of the word "drugs" ignore the plain and unambiguous meaning of the word "drugs," but other courts interpreting similar policy provisions have rejected analogous arguments. For example, in Guest v. Horace Mann Ins. Co., 310 S.E.2d 241 (Ga. Ct. App. 1983), the Georgia Court of Appeals considered an insurance policy which excluded coverage for deaths resulting from "drugs", unless prescribed by a Physician, voluntarily taken . . . ," rejected an argument made by the plaintiff in that case that the term "drugs" did not encompass over-the-counter medications, and

held that "appellant's attempt to limit the term 'drug' to narcotic drugs is simply without foundation." Guest, 310 S.E.2d at 243. Additionally, the limitation on the definition of the word "drugs" urged by the Plaintiff directly contradicts West Virginia law which classifies both legal medications and illegal substances as drugs. See The Uniform Controlled Substances Act, W. Va. Code § 60A-1-101, *et seq*. As noted by the Defendant, West Virginia law recognizes that even legal, prescription medications can be used in an illegal, illicit and recreational fashion. See W.Va. Code § 60A-4-401(a).

The Court believes, however, that the best evidence that the exclusionary language in question is not outrageous, overly broad or contrary to public policy is found in the fact that the West Virginia Commissioner of Insurance did, in fact, expressly approve the Policy at issue in this case. As noted by the Defendant, West Virginia Code § 33-6-9 expressly requires that the West Virginia Commissioner of Insurance disapprove any form of policy, application, rider or endorsement when it "contains or incorporates by reference any inconsistent, ambiguous, or misleading clauses, or exceptions or conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract" or if it further provides coverage that is "not sufficiently broad to be in the public interest."

For the foregoing reasons, the Court finds that there is no genuine issue of material fact with regard to the issue of whether the exclusions relied upon by Minnesota Life are outrageous, overly broad, or contrary to public policy and accordingly, the Defendant is entitled to summary judgment with regard to this issue as a matter of law.

### IV. CONCLUSION

For the foregoing reasons, Minnesota Life's Motion for Summary Judgment is **GRANTED**. Plaintiff's Complaint For Damages is **DISMISSED WITH PREJUDICE**, and the Clerk is directed to strike this matter from the Court's docket.

The Clerk is further directed to transmit a copy of this Order to all counsel of record.

Entered this 15th day of December, 2005.

/s/ Robert E. Maxwell_____
**ROBERT E. MAXWELL**
**UNITED STATES DISTRICT JUDGE**